# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

LINDA J. ARNOLD,         :
                              :
         Plaintiff      :     No. 3:15-CV-2103
                              :
       vs.             :     (Judge Nealon)
                              :
NANCY A. BERRYHILL, Acting  :
Commissioner of Social Security,[1]  :
                              :
         Defendant    :

## MEMORANDUM

On November 2, 2015, Plaintiff, Linda J. Arnold, filed this instant appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[3] under Titles

---

[1]. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017. See http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

[3]. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and 42 U.S.C. § 1381 et seq, respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

## BACKGROUND

Plaintiff protectively filed[4] her applications for DIB and SSI on November 28, 2012, alleging disability beginning on April 10, 2012, due to a combination of "compressed nerves in forearms, mental illness, tendonitis, chronic pain, depression, anxiety, PTSD, sciatic pain, lateral epicondylitis in both arms, and degenerative disc disease." (Tr. 10, 135).[5] These claims were initially denied by the Bureau of Disability Determination ("BDD")[6] on March 12, 2013. (Tr. 10). On April 5, 2013, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 10). An oral hearing was held on May 16, 2014,

---

4. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on January 15, 2016. (Doc. 10).

6. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

before administrative law judge Michelle Wolfe, ("ALJ"), at which Plaintiff and impartial vocational expert Nadine Henzes, ("VE"), testified. (Tr. 10). On June 25, 2014, the ALJ issued a unfavorable decision denying Plaintiff's DIB and SSI applications. (Tr. 10-21). On August 21, 2014, Plaintiff filed a request for review with the Appeals Council. (Tr. 6). On September 11, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-5). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on November 2, 2015. (Doc. 1). On January 15, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of her complaint on February 22, 2016. (Doc. 11). Defendant filed a brief in opposition on March 28, 2016. (Doc. 12). On April 7, 2016, Plaintiff filed a reply brief. (Doc. 13).

Plaintiff was born in the United States on September 14, 1963, and at all times relevant to this matter was considered an "individual closing approaching advanced age."[7] (Tr. 111). Plaintiff earned her GED in 1985, and can

---

7. Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(d).

communicate in English. (Tr. 134, 136). Her employment records indicate that she previously worked as a "production" worker in a factory. (Tr. 137). The records of the SSA reveal that Plaintiff had earnings in the years 1987 through 1988 and 1996 through 2012. (Tr. 127). Her annual earnings range from a low of one thousand eight hundred fifty-six dollars and fifty cents ($1,856.50) in 1987 to a high of thirty-eight thousand one hundred eight dollars and twelve cents ($38,108.12) in 2009. (Tr. 127). Her total earnings during this time period were five hundred thousand six hundred eighty dollars and sixty-two cents ($500,680.62). (Tr. 127).

In a document entitled "Function Report - Adult" filed with the SSA on January 8, 2013, Plaintiff indicated that she lived in a house alone. (Tr. 151). From the time she woke up to the time she went to bed, Plaintiff would take care of her personal needs, eat breakfast, take her medicine, lie down "for a while" before she got dressed, and try to do "daily chores." (Tr. 151). She had problems with personal care due to her arm impairments, took care of her cat with help from her son, prepared meals daily for "the average time" without being able to lift pots and pain without pain, vacuumed "one room at a time . . . [with] rest in between," did laundry "in small loads . . . once a week," washed the dishes "in a small amount . . . two (2) to three (3) times a week," and shopped in stores up to two (2)

times a week. (Tr. 152-154). Sometimes, her niece or son would come over to help her vacuum, do the laundry, and/ or take care of her cat. (Tr. 153).

In terms of physical abilities and limitations, when asked to check items that her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, or getting along with others. (Tr. 156). She noted: squatting, bending, standing for a long time, walking, sitting, kneeling, and stair climbing "hurt her back more;" reaching affected her arms and hands; and depression and anxiety affected her memory. (Tr. 156). She indicated she was able to walk for two (2) to three (3) blocks before needing to stop and rest for ten (10) to fifteen (15) minutes. (Tr. 156).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of her personal needs or to go places, but did need reminders to take her medicine. (Tr. 153, 155). She could pay bills, handle a savings account, count change, and use a checkbook. (Tr. 154). She could pay attention for ten (10) to fifteen (15) minutes, needed to sometimes re-read written instructions, needed to have spoken instructions sometimes repeated and would have to write them down, and was not able to finish what she started. (Tr. 156). She noted that she did not handles stress well and that handling changes in routine was "hard" due to anxiety. (Tr. 157).

Socially, Plaintiff went outside "4-5 times a week, depend[ing] on appointments," drove a car when she went out, and was able to go out alone. (Tr. 154). Her hobbies included reading, which she could only do a little of each day because her arms would bother her; watching television, which she would have to lie down to do because she could not "sit long;", gardening, which she stated she was unable to do anymore because she could "no longer do any type of yard work;" and going for walks, which she stated she no longer did since her illnesses began. (Tr. 155). Regarding spending time with others, she spent time talking to others on the phone for short periods of time. (Tr. 155). She noted that, on a regular basis, she went to counseling, group therapy, and her psychiatrist; shopping; and to the library "maybe 2 or 3 times a month." (Tr. 155). She did not have problems getting along with family, friends, neighbors, authority figures, or others. (Tr. 156-157).

Plaintiff also completed a questionnaire for her pain. (Tr. 159-160). She stated that her lower back pain began in 2005 and her forearm and elbow pain began in April 2010. (Tr. 159). Regarding the pain in her back, she described it as a constant dull pain located in the lumbar and sciatic areas that: sometimes spread into her tail bone and down her legs if she sat for too long; was worsened by doing "too many things;" was always present; and was relieved by lying down,

using heating pads and ice packs, and taking hot showers. (Tr. 159-160). Regarding her forearm and elbow pain, Plaintiff described it as a constant dull aching pain that: had increased over time; sometimes spread to her wrists and fingers; was aggravated by reaching, pushing, squeezing, and cold and stormy weather; worsened when she tried to "do too many things;" and was not relieved completely by pain relievers. (Tr. 159-160).

During the oral hearing on May 16, 2014, Plaintiff testified that she could not return to work, after being fired for missing too much time due to pain in her bilateral forearms and elbows, pain in the lumbar area of her back, sciatic pain that ran down her legs, anxiety, and depression. (Tr. 43, 50). She stated that she vacuumed one (1) room at a time, dusted once a month, and had to take breaks and rest while taking care for her personal needs such as showering, washing her face, and brushing her teeth. (Tr. 45). She testified she had to lie down to watch television instead of sitting. (Tr. 45). She indicated she rarely used the computer, did not read books or magazines, and sometimes had difficulty concentrating on television shows. (Tr. 45-46). She stated she shopped with her sister for basic needs, that she saw his sister "quite a bit," and that she got along with her very well. (Tr. 46-47).

In terms of exercise, Plaintiff indicated she stretched in the morning before

betting out of bed after which she would put heat followed by ice on her arms. (Tr. 46).  Regarding physical abilities, she stated she was able to walk about a block and stand for a half hour before needing to rest due to pain in her lower back and sciatic region; stand for a half hour; was unable to sit for long periods of time due to sciatic pain that traveled down both of her legs; and was able to carry a gallon of milk with two hands.  (Tr. 46-47).

Regarding her mental health impairments, Plaintiff described her anxiety symptoms, which she stated included anxiety attacks, chest heaviness, heart palpitations, difficulty concentrating, and racing thoughts.  (Tr. 50).  She also described her depression, that caused a feeling of not wanting to get up in the morning, to take care of her personal needs to go out of her home with her sister. (Tr. 50-51).  She testified that the medications she was taking for these impairments caused fatigue and drowsiness.  (Tr. 51).

**MEDICAL RECORDS**

Only the medical record for the relevant time period from the alleged onset date of disability of April 10, 2012 through the date of the ALJ's decision on June 25, 2014, will be reviewed.

On April 30, 2012, Plaintiff had a follow-up appointment with Hans P. Olsen, M.D., for "bilateral lateral epicondylitis status post release and probable

bilateral radial tunnels." (Tr. 587). It was noted that Plaintiff previously received an injection into her the "radial tunnel" in January that offered her a few months of relief. (Tr. 587). It was noted that the pain "continued to be problematic" and was rated at a seven (7) out of ten (10), was worse with "grip grasp" and increased activities, and was localized to the lateral epicondylar and radial tunnel areas. (Tr. 587). The impression was that Plaintiff had status post bilateral elbow arthroscopies with lateral epicondylar releases; mild left elbow degenerative joint disease; and bilateral radial tunnel syndrome. (Tr. 587). Plaintiff received injections at this visit into the bilateral edpicondylar and radial tunnel areas. (Tr. 587-58).

On May 17, 2012, Plaintiff had an initial psychiatric evaluation at Northeast Counseling Services. (Tr. 675). Plaintiff reported she had increasing depression, crying spells, an overall inability to function, lack of energy, insomnia, feelings of helplessness and hopelessness, weight gain, and anxiety. (Tr. 675). It was noted that she had been seeing Dr. Sperezza, who treated her with Celexa, Trazadone, and Klonopin. (Tr. 675). A mental status examination revealed: alertness, attentiveness and reasonableness with intact reality testing; fair eye contact; tearfulness; articulated, goal-directed, relevant speech with no evidence of a though disorder, delusions, or hallucinations; no suicidal thoughts or intent; mood

fluctuations; average intelligence; clear sensorium; and reasonable insight and judgment. (Tr. 676). Plaintiff had an Axis I diagnosis of Major Depressive Disorder that was listed as moderate to severe. (Tr. 676). Plaintiff was prescribed medications, including Prozac, Desyrel, and Klonopin. (Tr. 676). Seroquel was discontinued. (Tr. 676).

On June 6, 2012, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 673). Plaintiff reported she was depressed and anxious. (Tr. 673). A mental status examination revealed: an appropriate appearance and good hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a depressed mood; a flat affect; intact memory and judgment; good eye contact; and fair insight. (Tr. 673). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 673). Her prescribed medications included Klonopin and Prozac. (Tr. 672).

On June 22, 2012, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 672). Plaintiff reported she was depressed and anxious. (Tr. 672). A mental status examination revealed: an appropriate appearance and good hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a depressed mood; a blunted affect; intact memory and judgment; good eye contact; and fair insight. (Tr. 672). Plaintiff's Axis I diagnosis was Major Depressive

Disorder. (Tr. 672). Her prescribed medications included Klonopin and Prozac. (Tr. 672).

On August 6, 2012, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 668). Plaintiff reported she was feeling better. (Tr. 668). A mental status examination revealed: an appropriate appearance and good hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a depressed mood; a blunted affect; intact memory and judgment; good eye contact; and good insight. (Tr. 668). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 668). Her prescribed medications included Klonopin and Zoloft. (Tr. 668). Her progress on meeting her goals of becoming less depressed and anxious and improving her ability to function was listed as "improving" for all goals. (Tr. 669).

On October 24, 2012, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 664). Plaintiff reported she was anxious, depressed, and tearful. (Tr. 664). A mental status examination revealed: an appropriate appearance and fair hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a depressed mood; a blunted affect; intact memory, insight, and judgment; and good eye contact. (Tr. 664). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 664). Her prescribed medications included Klonopin and Effexor.

(Tr. 664).

On November 21, 2012, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 663). Plaintiff reported she was anxious, depressed, and tearful. (Tr. 663). A mental status examination revealed: an appropriate appearance and fair hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a depressed mood; a constricted affect; intact memory and judgment; good eye contact; and fair insight. (Tr. 663). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 663). Her prescribed medications included Klonopin. (Tr. 663).

On December 14, 2012, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 661). Plaintiff reported she was depressed and tearful and had suicidal thoughts without intent. (Tr. 661). A mental status examination revealed: an appropriate appearance and fair hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a depressed mood; an appropriate affect; intact memory and judgment; good eye contact; and fair insight. (Tr. 661). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 661). Her medications included Effexor, Trazadone, and Klonopin. (Tr. 661). Her progress was listed as "mild" in terms of her goals of becoming less depressed and anxious and in improving functioning. (Tr. 662).

On December 19, 2012, Plaintiff had an appointment at Volunteers in Medicine. (Tr. 648). Her physical examination revealed an anxious state; good eye contact; bilateral lumbar tenderness; and limited range of motion in the bilateral shoulders and elbows. (Tr. 648). The impression was that Plaintiff had depression; anxiety; degenerative disc disease; bilateral elbow impairment; and urinary frequency. (Tr. 648).

On January 3, 2013, Plaintiff had a chiropractic appointment at Volunteers in Medicine for lower back and neck pain. (Tr. 645). A physical examination revealed triggers point in the cervical paraspinal area and the left and right trapezius muscles and spinal subluxation at the C6, C7, and T1 levels. (Tr. 646). Treatment was aimed at pain relief and decreasing inflammation and involved spinal manipulation and moist heat. (Tr. 646).

On January 11, 2013, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 660). Plaintiff reported being depressed. (Tr. 660). A mental status examination revealed: an appropriate appearance and fair hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a depressed mood; a blunted affect; intact memory and judgment; good eye contact; and fair insight. (Tr. 660). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 660). Her medications included Effexor and Klonopin. (Tr. 660).

On January 23, 2013, Melissa Diorio, Psy.D, performed a Psychiatric

Review Technique based on Plaintiff's medical records up to that date. (Tr. 64-

65). Dr. Diorio opined that Plaintiff had a medically determinable impairment

under Impairment Listing 12.04, but that she did not meet either the "B" criteria or

"C" criteria of the listing because: (1) she had mild restriction of activities of daily

living; (2) she had mild difficulties in maintaining social functioning; (3) she had

moderate difficulties in maintaining concentration, persistence, or pace; (4) she

had no repeated episodes of decompensation, each of extended duration; and (5)

evidence did not establish the presence of "C" criteria. (Tr. 65). Dr. Diorio also

completed a Mental Residual Functional Capacity Assessment form, in which she

opined Plaintiff: (1) was moderately limited in the ability to maintain attention and

concentration for extended periods and the ability to complete a normal workday

and workweek without interruptions from psychologically based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest

periods; (2) was capable of working within a work schedule and at a consistent

pace, make simple decision, carry out very short simple instructions, maintain

regular attendance, and be punctual; and (3) was able to meet the basic mental

demands of competitive work on a sustained basis. (Tr. 68).

On February 20, 2013, Plaintiff underwent a consultative examination

performed by John Citti, M.D. (Tr. 697). A physical examination revealed: full range of motion of all her joints and upper extremities; a forward bend at forty-five (45) degrees with her finger a foot and a half from the floor that caused back spasms; a positive straight leg raise test on the right and left legs; and deep tendon reflexes showed "the right leg to be 2+ in the ankle and the left to be 1+. (Tr. 699). Dr. Citti's impression was that Plaintiff had failed back syndrome with a lumbar fusion possibly helping her back and sciatic pain; failed bilateral lateral epicondylitis surgeries with possible nerve damage; and a history of depression. (Tr. 699-700). Dr. Citti completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities." (Tr. 701-703). In this form, he opined that Plaintiff could: frequently lift and/ or carry two (2) to three (3) pounds and occasionally lift and/ or carry up a maximum of ten (10) pounds; stand and/ or walk for up to two (2) hours with the ability to sit; sit for less than ten (10) minutes at a time; engage in limited lower extremity pushing and/ or pulling; never bend, kneel, stoop, crouch, balance, or climb; and reach, handle, finger, feel, see, hearing, speak, taste, and smell without limitation. (Tr. 701-702).

On March 7, 2013, Stephen Treiber, SDM,[8] stated, based on a review of

8. "SDM" is an abbreviation for "Single Decision Maker." http://nls.org/Disability/VocationalRehabilitation/BenefitsManagementManual2009Version/Chapter1. After an extensive review of the record and other cites, there

Plaintiff's records, that Plaintiff: could occasionally lift and/ or carry up to twenty (20) pounds and frequently lift and/ or carry up to ten (10) pounds; could stand and/ or walk for up to six (6) hours in an eight (8) hour workday; could sit for up to two (2) hours with normal breaks; could engage in unlimited pushing and pulling within the aforementioned weight restrictions; could frequently climb ramps and stairs, balance, and crouch; could occasionally stoop, kneel, crawl, and climb ladders, ropes, or scaffolds; and had no manipulative, visual, communicative, or environmental limitations.  (Tr. 66-67).

On June 6, 2013, Plaintiff received injections into both elbows for bilateral lateral epicondylitis, radial tunnel syndrome, and mild degenerative joint disease of the left elbow.  (Tr. 745).  Her medications at the time of that appointment

is no evidence that Stephen Treiber is a medical doctor, doctor of osteopathic medicine, or any other title in the medical profession.  Therefore, his opinion should not be taken into account by the ALJ when determining a plaintiff's residual functional capacity.  See Rhyder v. Colvin, 2017 U.S. Dist. LEXIS 2894, at *15-18 (M.D. Pa. Jan. 7, 2017) (Kosik, J.) ("On May 19, 2010, Frank Cristaudo, the Chief Administrative Law Judge for the Social Security Administration, issued a memorandum citing POMS Instruction DI 24510.05004, instructing all ALJs that RFC determinations by SDM's should not be afforded any evidentiary weight at the administrative hearing level.  Therefore, any assignment of any evidentiary weight to an SDM's opinion is an error since they are 'not a medical professional of any stripe, and a finding from such an individual is entitled to no weight as a medical opinion, or to consideration as evidence from other non-medical sources.' Bolton v. Astrue, Civ. No. 07-612, 2008 U.S. Dist. LEXIS 38568, at *4 (M.D. Fla. May 12, 2008) (internal citations omitted); see Yorkus v. Astrue, 2011 U.S. Dist. LEXIS 154471 (E.D. Pa. Feb. 28, 2011)").

included Citalopram, Clonazepam, Trazadone, and Zantac. (Tr. 745).

On June 21, 2013, Plaintiff underwent an MRI of the lumbar spine with and without contrast. (Tr. 738). The impression was that Plaintiff had: (1) degenerative changes involving the lumbar spine, with disc desiccation, mild posterior disc bulge and facet joint hypertrophy at multiple levels, in particular the L4-L5 level; "marrow" edema in the L4 and L5 vertebral bodies along the L4-L5 disc space secondary to degenerative change; mild posterior disc bulge and facet joint hypertrophy at the L2-L3 level with mild narrowing of the spinal canal and no significant spinal stenosis; mild posterior disc bulge and facet joint hypertrophy at the L3-L4 level without any significant associated spinal canal and foraminal stenosis; at the L4-L5 level, posterior osteophyte complex with facet joint hypertrophy causing moderate to severe right and moderate left foraminal stenosis, prominent narrowing of the lateral recesses, and spinal decompression from a prior laminectomy; L5-S1 facet joint hypertrophy narrowing the right lateral recess; and a slightly disproportionately prominent left adrenal gland. (Tr. 739).

On June 21, 2013, Plaintiff also underwent an MRI of her cervical spine without contrast. (Tr. 740). The MRI revealed: facet and "uncovertable" joint hypertrophy at the C3-C4 level causing moderate to severe left and mild right foraminal stenosis; minimal narrowing of the spinal canal and moderate left and

mild right foraminal narrowing at the C4-C5 level; moderate to severe left and mild right foraminal narrowing at the C5-C6 level with a prominent left posterior paracentral disc extrusion mildly narrowing the spinal canal; moderate bilateral foraminal stenosis at the C6-C7 level with mild narrowing of the spinal canal secondary to the posterior disc osteophyte complex and a small central disc protrusion; and patchy fluid in the left mastoid air cells.  (Tr. 741).

On June 21, 2013, Plaintiff had an appointment with Dr. Olsen for follow-up of bilateral lateral epicondylitis status post surgical releases and symptoms consistent with bilateral radial tunnel syndrome.  (Tr. 778).  It was noted that injections performed on April 20, 2012 helped for "a good 3+ months and did take a significant portion of her pain away."  (Tr. 778).  She had not returned after that appointment due to loss of health insurance.  (Tr. 778).  She rated her pain, located in the radial tunnel and lateral epicondylar areas,  at an eight (8) out of ten (10), with the right side being worse than the left.  (Tr. 778).  The impression was that Plaintiff had: status post bilateral elbow arthroscopies with lateral epicondylar releases; mild left elbow degenerative joint disease; and bilateral radial tunnel syndrome.  (Tr. 778).  Plaintiff received injections into the bilateral epicondylar and radial tunnel areas.  (Tr. 779).

On July 8, 2013, Plaintiff had an appointment at Northeast Counseling

Services. (Tr. 833). A mental status examination revealed: an appropriate

appearance and good hygiene; a cooperative attitude; calm motor activity;

spontaneous speech; a depressed mood; an appropriate affect; relevant thought

processes; intact memory and judgment; fair insight; and good eye contact. (Tr.

833). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 833). Her

medications included Effexor, Abilify, and Klonopin. (Tr. 833).

On September 4, 2013, Plaintiff had an appointment at Northeast

Counseling Services. (Tr. 832). A mental status examination revealed: an

appropriate appearance and good hygiene; a cooperative attitude; calm motor

activity; spontaneous speech; a depressed mood; an appropriate affect; relevant

thought processes; intact memory and judgment; fair insight; and good eye

contact. (Tr. 832). Plaintiff's Axis I diagnosis was Major Depressive Disorder.

(Tr. 832). Her medications included Effexor, Abilify, and Klonopin. (Tr. 832).

On October 7, 2013, Plaintiff had an appointment with Dr. Olsen for follow-

up of bilateral lateral epicondylitis status post surgical releases and bilateral radial

tunnel syndrome. (Tr. 789). She stated the injections she received on June 21,

2013, may have helped for about four (4) to five (5) weeks. (Tr. 789). She rated

her pain at a seven (7) to eight (8) out of ten (10), with the pain occurring in

multiple areas of her elbows, and noted difficulty with increasing use. (Tr. 789).

Her medications at the time of that appointment included Citalopram, Clonazepam, Trazadone, and Zantac. (Tr. 743). She received injections into the bilateral radial tunnel tunnels. (Tr. 743, 789). Dr. Olsen opined that Plaintiff would be continually limited regarding her arms and that both elbows would be painful on a permanent basis. (Tr. 789).

On October 22, 2013, Plaintiff had an appointment at Northeast Counseling. (Tr. 831). Plaintiff's mental status examination revealed a euthymic mood with a related affect and orientation to person, place, and time. (Tr. 831). Plaintiff reported that her panic attacks had lessened to twice daily last for up to fifteen (15) minutes and that her crying spells had "been high" occurring up to twice daily lasting for up to ten (10) minutes and described as moderate to severe. (Tr. 831). Plaintiff was noted to appear motivated and "invested" in the therapist's suggestions. (Tr. 831).

On October 30, 2013, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 830). A mental status examination revealed: an appropriate appearance and good hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a depressed mood; an appropriate affect; relevant thought processes; intact memory and judgment; fair insight; and good eye contact. (Tr. 830). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 830). Her

medications included Effexor, Abilify, and Klonopin.  (Tr. 830).

On November 11, 2013, Plaintiff had a follow-up appointment with Dr. Olsen for follow-up of bilateral lateral epicondylitis status post surgical releases and bilateral radial tunnel syndrome.  (Tr. 800).  She stated the radial tunnel injections she received a month earlier did not provide good relief.  (Tr. 800).  She rated her pain at a seven (7) out of ten (10).  (Tr. 800).  She received injections into the bilateral lateral epicondyles only.  (Tr. 800).  Dr. Olsen warned Plaintiff about the continued use of injections of her lateral epicondyles, which included injury to the lateral ulnar collateral ligament, which might cause significant difficulties.  (Tr. 800).

On December 20, 2013, Plaintiff had an appointment at Northeast Counseling Services.  (Tr. 829).  A mental status examination revealed: an appropriate appearance and good hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a depressed mood; an appropriate affect; relevant thought processes; intact memory and judgment; fair insight; and good eye contact.  (Tr. 829).  Plaintiff's Axis I diagnosis was Major Depressive Disorder.  (Tr. 829).  Her medications included Pamelor and Klonopin.  (Tr. 829).

On February 17, 2014, Plaintiff had a follow-up appointment with Dr. Olsen for bilateral lateral epicondylitis status post surgical releases and bilateral radial

tunnel syndrome. (Tr. 811). She stated the bilateral lateral epicondyles injections she received in November gave her relief for one (1) to two (2) months. (Tr. 811). She rated her pain at a seven (7) out of ten (10), and stated the pain was recurring and was mostly located in the lateral arms and forearms. (Tr. 811). A physical examination revealed full flexion, extension, pronation, and supination in her elbows without significant limitations or instabilities; an ability to make a full fist and extend all fingers fully; and radial tunnel type forearm pain. (Tr. 811). She received injections into the bilateral lateral epicondyles only. (Tr. 811). Dr. Olsen warned Plaintiff about the continued use of injections of her lateral epicondyles, which included injury to the lateral ulnar collateral ligament. (Tr. 811). Dr. Olsen stated that he was not sure that Plaintiff's pain in her forearms would ever go away. (Tr. 812).

On April 14, 2014, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 828). A mental status examination revealed: an appropriate appearance and good hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a euthymic mood; an appropriate affect; relevant thought processes; intact memory and judgment; good insight; and good eye contact. (Tr. 828). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 828). Her medications included Effexor and Klonopin. (Tr. 828).

On April 23, 2014, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 826). Plaintiff reported experiencing panic twice daily for up to twenty (20) minutes at a time and that her crying spells had improved and occurred up to three (3) times a week for up to twenty (20) minutes at a time. (Tr. 826). Plaintiff was instructed to continue with individual and group therapy to prevent decompensation. (Tr. 826).

On May 1, 2014, Plaintiff underwent an x-ray of her lumbar spine for worsening back pain. (Tr. 822). This revealed Plaintiff had: severe chronic degenerative disc disease at the L4-L5 level with mild spondylosis and moderate facet arthropathy more pronounced on the right side; mild degenerative disc disease at the L5-S1 level with mild facet arthropathy; and small anterior osteophytes at the L3 level. (Tr. 822).

On May 20, 2014, Plaintiff had an appointment at Northeast Counseling Services. (Tr. 827). A mental status examination revealed: an appropriate appearance and good hygiene; a cooperative attitude; calm motor activity; spontaneous speech; a euthymic mood; an appropriate affect; relevant thought processes; intact memory and judgment; good insight; and good eye contact. (Tr. 827). Plaintiff's Axis I diagnosis was Major Depressive Disorder. (Tr. 827). Her medications included Effexor and Klonopin. (Tr. 827).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and

claims for disability insurance benefits.  <u>See</u> 20 C.F.R. § 404.1520; <u>Poulos</u>, 474

F.3d at 91-92.  This process requires the Commissioner to consider, in sequence,

whether a claimant (1) is engaging in substantial gainful activity, (2) has an

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  <u>Id.</u>  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  <u>Id.</u>  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  <u>Id.</u>  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  <u>Id.</u>; 20 C.F.R. §§ 404.1545 and 416.945;

<u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2016. (Tr. 12). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of April 10, 2012. (Tr. 12).

At step two, the ALJ determined that Plaintiff suffered from the severe[9]

_____

9. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's

combination of the following impairments: "degenerative disc disease of the lumbar and cervical spine, status post bilateral elbow arthroscopies with lateral epicondylar releases, bilateral radial tunnel syndrome, degenerative joint disease, major depressive disorder (20 C.F.R. 404.1520(c) and 20 C.F.R. 416.920(c))." (Tr. 12).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 13-14).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work with limitations. (Tr. 14-19). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 20 CFR 416.967(b). [Plaintiff] can do occasional balancing, stooping, crouching, crawling, kneeling and climbing but never on ladders[,] ropes[,] or scaffolds. She can do occasional pushing and pulling with upper and lower extremities. She must avoid concentrated exposure to temperature extremes of cold, heat and vibrations. [Plaintiff] can do work that involves simple routine tasks, no complex tasks[,] and a low stress work environment defined as occasional decision making and occasional changes in work setting. [Plaintiff] can frequently

---

ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

reach overhead.  She can do frequent lateral/ front reaching with her arms. [Plaintiff] can have occasional interaction with the public, coworkers and supervisors.

(Tr. 14-15).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))."  (Tr. 20).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between April 10, 2012, the alleged onset date, and the of the ALJ's decision.  (Tr. 20-21).

## DISCUSSION

On appeal, Plaintiff asserts that: (1) the ALJ erred in determining Plaintiff's RFC because she substituted her own lay opinion for that of the medical ones, did not adequately explain why she gave no weight to the opinion of Dr. Citti, and did not take into account all the limitations as opined by Dr. Diorio despite giving this opinion great weight; and (2) the ALJ's credibility determination of Plaintiff is not supported by substantial evidence.  (Doc. 11, pp. 9-25).  Defendant disputes these contentions.  (Doc. 12, pp. 9-25).

## 1. **Residual Functional Capacity Determination**

Plaintiff asserts that the ALJ erred in determining her RFC because she substituted her own lay opinion for that of the medical opinions rendered, did not adequately explain why she gave no weight to the opinion of Dr. Citty, and did not take into account all of the limitations as opined by Dr. Diorio despite giving this opinion great weight. (Doc. 11, pp. 9-14).

The responsibility for deciding a claimant's RFC rests with the administrative law judge. See 20 C.F.R. § 404.1546. It is recognized that the RFC assessment must be based on a consideration of all the evidence in the record, including the testimony of the Plaintiff regarding activities of daily living, medical records and opinions, lay evidence, and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir. 2000). The Commissioner's regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s), including a claimant's symptoms, diagnosis and prognosis, what a claimant can still do despite impairments(s), and a claimant's physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. <u>See</u>, <u>e.g.</u>, <u>Morales v. Apfel</u>, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." <u>Morales</u>, 225 F.3d at 317; <u>Plummer</u>, 186 F.3d at 429; <u>see also</u> 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." <u>Morales</u>, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge

may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances." SSR 96-6p, 1996 SSR LEXIS 3. This regulation does not define "appropriate circumstances," but gives an example that "appropriate circumstances" exist when a non-treating, non-examining source had a chance to review "a <u>complete case record</u> . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." <u>Id.</u> (emphasis added).

Regardless of the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. <u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." <u>Burnett v. Comm'r of Soc. Sec.</u>, 220 F.3d 112, 119-20 (3d Cir. 2000).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. <u>Morales</u>, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation, or lay opinion. <u>Id.</u> An ALJ may not disregard the medical opinion of

a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

As two commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand

> for 30 minutes, two hours, six hours, or eight hours. That
> determination must be made by a doctor. Once the doctor has
> determined how long the claimant can sit, stand or walk, and
> how much weight the claimant can lift and carry, then the ALJ,
> with the aid of a vocational expert if necessary, can translate
> that medical determination into a residual functional capacity
> determination. Of course, in such a situation a residual
> functional capacity determination is merely a mechanical
> determination, because the regulations clearly and explicitly
> define the various types of work that can be performed by
> claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and

Procedure in Federal Courts, 287-88 (2011) (emphasis added). The administrative

law judge cannot speculate as to a claimant's residual functional capacity, but

must have medical evidence, and generally a medical opinion regarding the

functional capabilities of the claimant, supporting his or her determination. Doak,

790 F.2d at 29 ; see Snyder v. Colvin, 2017 U.S. Dist. LEXIS 41109 (M.D. Pa.

March 22, 2017) (Brann, J.) ("I find that substantial evidence does not support the

ALJ's ultimate determination. The ALJ's decision to discredit, at least partially,

every opinion of every medical doctor's RFC assessment of Snyder left the ALJ

without a single medical opinion to rely upon in reaching a RFC determination.

'Rarely can a decision be made regarding a claimant's residual functional capacity

without an assessment from a physician regarding the functional abilities of the

claimant.' Maellaro v. Colvin, Civ. No. 3:12-01560, 2014 U.S. Dist. LEXIS

84572, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014).”); Washburn v. Colvin, 2016 U.S. Dist. LEXIS 144453 (M.D. Pa. October 19, 2016) (Conner, J.); Wright v. Colvin, 2016 U.S. Dist. LEXIS 14378, at *45-46 (M.D. Pa. Jan. 14, 2016) (Rambo, J.) (“Chandler stated that an ALJ need not obtain medical opinion evidence and was not bound by any treating source medical opinion. Id. However, both these statements are dicta. In Chandler, the ALJ had medical opinion evidence and there was no contrary treating source opinion. Id. ‘[D]ictum, unlike holding, does not have strength of a decision ‘forged from actual experience by the hammer and anvil of litigation.’ . . . the only precedential holding in Chandler is the unremarkable finding that an ALJ may rely on a state agency medical opinion that the claimant is not disabled when there are no medical opinions from treating sources that the claimant is disabled. See Chandler, 667 F.3d at 361-63. . . . Consequently, with regard to lay reinterpretation of medical evidence, Frankenfield, Doak, Ferguson, Kent, Van Horn, Kelly, Rossi, Fowler and Gober continue to bind district Courts in the Third Circuit.”); Maellaro v. Colvin, 2014 U.S. Dist. LEXIS 84572, at *32-34 (M.D. Pa. June 18, 2014) (Mariani, J.) (“The ALJ’s decision to reject the opinions of Maellaro’s treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical

opinion.  Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.  *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence.").  *See also Arnold v. Colvin*, 3:12-CV-02417, 2014 U.S. Dist. LEXIS 31292, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014); *Gormont v. Astrue*, 3:11-CV-02145, 2013 U.S. Dist. LEXIS 31765, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013); *Troshak v. Astrue*, 4:11-CV-00872, 2012 U.S. Dist. LEXIS 137945, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012).  The ALJ's decision to discredit, at least partially, every residual functional capacity assessment proffered by medical experts left her without a single medical opinion to rely upon.  For example, three physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223.  In rejecting these three opinions, there were no other medical opinions upon which the ALJ could base her decision that Maellaro

essentially had no limitations in his ability to stand or walk.  Tr. 283.

Consequently, the ALJ's decision to reject the opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's residual functional capacity, cannot be said to be supported by substantial evidence."); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46 (M.D. Pa. Feb. 15, 2012) (Conaboy, J.) (Doc. 10) ("Any argument from the Commissioner that his administrative law judges can set the residual function capacity in the absence of medical opinion or evidence must be rejected in light of Doak.  Furthermore, any statement in Chandler which conflicts (or arguably conflicts) with Doak is *dicta* and must be disregarded.  Government of Virgin Islands v. Mills, 634 F.3d 746, 750 (3d Cir. 2011) (a three member panel of the Court of Appeals cannot set aside or overrule a precedential opinion of a prior three member panel). "); Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-39 (M.D. Pa. Jan. 31, 2012) (Munley, J.) (Doc. 14); Crayton v. Astrue, Civil No. 10-1265, slip op. at 38-39 (M.D. Pa. Sept. 27, 2011) (Caputo, J.) (Doc. 17).

In the case at hand, regarding Plaintiff's physical limitations,  Dr. Citti a consultative examiner opined that Plaintiff: could frequently lift and/ or carry two (2) to three (3) pounds and occasionally lift and/ or carry up to a maximum of ten (10) pounds; could stand and/ or walk for up to two (2) hours with the ability to sit; could sit for less than ten (10) minutes at a time; could engage in limited lower

38

extremity pushing and/ or pulling; could never bend, kneel, stoop, crouch, balance, or climb; and could reach, handle, finger, feel, see, hearing, speak, taste, and smell without limitations.  (Tr. 701-702).  The ALJ gave no weight to the opinion of Dr. Citti because "they are not consistent with his minimal findings upon physically examining [Plaintiff] . . . [and] are also inconsistent with his answers to additional questions on March 5, 2013[,] in which he replied that [Plaintiff] walked well with subjective pain."  (Tr. 19).

Regarding mental health impairments, the ALJ gave great weight to the opinion of Dr. Diorio, the state agency physician who opined Plaintiff: (1) had mild restriction of activities of daily living; (2) had mild difficulties in maintaining social functioning; (3) had moderate difficulties in maintaining concentration, persistence, or pace; (4) had no repeated episodes of decompensation, each of extended duration; (5) was moderately limited in the ability to maintain attention and concentration for extended periods and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) was capable of working within a work schedule and at a consistent pace, make simple decision, carry out very short simple instructions, maintain regular attendance, and be punctual; and (7) was able to

meet the basic mental demands of competitive work on a sustained basis. (Tr. 65, 68).

Plaintiff argues that the weight the ALJ gave to the opinion of Dr. Citti is not supported by substantial evidence because it lacks adequate explanation, and moreover, that, regarding Plaintiff's physical limitations, the ALJ substituted her own lay opinion in formulating Plaintiff's physical RFC because no other opinions were rendered that support the RFC determination. (Doc. 11, pp. 9-14). This Court agrees with Plaintiff that substantial evidence does not support the ALJ's RFC determination that Plaintiff could perform light work with the limitations noted because the ALJ discredited the only medical opinion of record regarding Plaintiff's physical limitations, which was that of Dr. Citti.

This Court cannot ascertain from the analysis conducted by the ALJ how she was able to determine a residual functional capacity that included, among other things, an ability to lift twenty (20) pounds occasionally, which differed from the medical findings and opinion of the only physician to render an opinion limiting Plaintiff to a maximum lifting weight of ten (10) pounds. (Tr. 701). The very definition of "light work" found in 20 C.F.R. § 416.967(b) makes it all the more important that this case be remanded, for this regulation is as follows:

Light work involves lifting no more than 20 pounds at a time

with frequent lifting or carrying of objects weighing up to 10
pounds. Even though the weight lifted may be very little, a job
is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls. To be considered
capable of performing a full or wide range of light work, you
must have the ability to do substantially all of these activities.
If someone can do light work, we determine that he or she can
also do sedentary work, unless there are additional limiting
factors such as loss of fine dexterity or inability to sit for long
periods of time.

20 C.F.R. § 416.967(b) (emphasis added). The fact that the ALJ gave no weight to

Dr. Citti's opinion, which is the only opinion that addressed weight restrictions

and limited Plaintiff to lifting ten (10) pounds maximum, but then implicitly

concluded that Plaintiff could perform light work without limiting the weight that

could be lifted and/ or carried by Plaintiff, suggests that the ALJ improperly

reinterpreted the medical evidence in arriving at the RFC determination because

the record provides no other evidence to support this conclusion.   See Snyder,

2017 U.S. Dist. LEXIS 41109 at *13-14 ("The ALJ failed to point to any specific

medical evidence that would support a contrary opinion on Snyder's

standing/walking capabilities, and as a result, it appears that the ALJ was forced to

reach a RFC determination without the benefit of any medical opinion.

Accordingly, the ALJ's conclusion is not supported by substantial evidence.").

Therefore, because it is unclear as to how the ALJ concluded that Plaintiff was

able to perform light work, which by definition involves lifting up to twenty (20) pounds, without adding any weight restrictions to the RFC determination, remand is warranted pursuant to 42 U.S.C. § 405(g).

This Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them moot. Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011 U.S. Dist. LEXIS 40545, 1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: September 27, 2017

**/s/ William J. Nealon**
**United States District Judge**